**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| SAM NISSEN and MIRANDA NISSEN, on their own behalf and on behalf of their minor child, Child A, | No. 20-CV-2098-CJW-MAR |
| Plaintiffs, | |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| CEDAR FALLS COMMUNITY SCHOOL DISTRICT, | |
| Defendant. | |

———————————————

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................ 2

II.    SUMMARY JUDGMENT STANDARD ............................................... 11

III.   TITLE IX CLAIM ...................................................................... 14

       A.    Deliberate Indifference .......................................................... 14

             1.    Failure to Conduct a Title IX Investigation ........................... 18

             2.    Clearly Unreasonable ................................................. 20

             3.    Causal Nexus ......................................................... 26

       B.    Nature of the Harassment ...................................................... 28

IV.    SECTION 1983 CLAIM ................................................................ 34

V.     CONCLUSION .......................................................................... 42

Case 6:20-cv-02098-CJW-MAR   Document 34   Filed 03/23/22   Page 1 of 42

This matter is before the Court on defendant's Motion for Partial Summary Judgment. (Docs. 23 & 24).[1] Plaintiffs timely resisted (Doc. 29) and defendant timely replied (Doc. 32).

For the following reasons, defendant's Motion for Summary Judgment (Doc. 23) is **granted in part and denied in part**.

## I.    BACKGROUND

This case involves an elementary school student who plaintiffs allege was sexually assaulted and harassed by another elementary school student who attended the same school. The following facts are undisputed unless otherwise noted.[2] The Court will discuss additional facts as they become necessary to its analysis.

Child A is the son of Miranda Nissen ("Miranda") and Sam Nissen ("Sam") (together, "the Nissens" or "plaintiffs"). (Docs. 23-1, at 1; 29-1, at 1). Child A began attending school in the Cedar Falls Community School District ("District" or "defendant") in the fall of 2016. (Docs. 23-1, at 1; 29-1, at 1). In October 2016, Child A enrolled in fourth grade at North Cedar Elementary School ("North Cedar"). (Docs. 23-1, at 1; 29-1, at 1–2). During his fourth-grade year, Child A was bullied, (Docs. 23-1, at 1; 29-1, at 2), and he struggled with anxiety. (Docs. 23-1, at 2; 29-1, at 2–3). His classmate, Child B, made fun of Child A on a daily basis "by telling fat jokes and poverty

---

[1] Defendant also filed a 2-page Motion for Partial Summary Judgment at Doc. 24 which is exactly the same as the 2-page Motion for Partial Summary Judgment at Doc. 23. Because the motion at Doc. 23 encompasses all the summary judgment documents, that is the motion the Court references in this order.

[2] Both parties argue that the other party's statement of material facts relies in part on hearsay statements. (*See* Docs. 29-1 & 32-1). A court cannot consider inadmissible hearsay when deciding a motion for summary judgment because it can only assess the evidence on which a jury could rely, and a jury cannot properly rely on inadmissible hearsay. *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). For this reason, the Court will first assess the parties' arguments based on undisputed facts and then, as necessary, address the parties' arguments about whether additional evidence constitutes inadmissible hearsay.

Case 6:20-cv-02098-CJW-MAR   Document 34   Filed 03/23/22   Page 2 of 42

jokes." (Docs. 23-1, at 1; 29-1, at 2). The two children shared the same classroom and rode the same school bus. (Docs. 23-1, at 2; 29-1, at 2).

At the beginning of his fifth-grade year, Child A continued to struggle with anxiety. (Docs. 23-1, at 2; 29-1, at 2–3). Child A, the Nissens, and North Cedar worked with Child A's outside counselor, Jack Schaefer ("Mr. Schaefer") to cope with Child A's anxiety and improve Child A's educational experience. (*See* (Doc. 23-1, at 4; 29-1, at 10).

On September 24, 2018, Miranda informed North Cedar's principal, Katie Johnston ("Principal Johnston"), that Child A's anxiety was "intense" and informed her that Child A "was ill during the night because of anxiety about going to school in the morning." (Docs. 23-1, at 2; 29-1, at 2–3).

In the fall of his fifth-grade year, Child A informed Miranda that although Child B had bullied him before, he and Child B were now going to be friends. (Docs. 23-1, at 2; 29-1, at 3). Child B was still in the same class as Child A and still rode the same school bus. (*See* Docs. 23-1, at 3; 29-1, at 5). Child A invited Child B over to the Nissen family home on October 1, 2018, to celebrate Child A's birthday. (Docs. 23-1, at 2; 29-1, at 4). Miranda described Child B's behavior during this visit as "overly polite," "very chatty," and "helpful." (Docs. 23-1, at 2; 29-1, at 4).

On October 14, 2018, Child B returned to the Nissen Home for a playdate. (Docs. 23-1, at 2; 29-1, at 4–5). He stayed the whole day. (Docs. 23-1, at 2; 29-1, at 4–5). Through November 2018, Child A and Child B continued to share the same classroom and ride the same school bus. (Docs. 23-1, at 3; 29-1, at 5)

On November 25, 2018, Child A told his parents that Child B had sexually assaulted him during the playdate on October 14, 2018. (Docs. 23-1, at 3; 29-1, at 5). Specifically, Miranda stated that Child A told her that Child B had raped him twice by

forcibly sodomizing him, and that Child B told Child A if he did not comply, then "he could either go to the hospital or just die." (Docs. 29-2, at 5; 32-1, at 8).

On the morning of November 26, 2018, before school began, Miranda called Principal Johnston and told her that a serious incident had taken place between Child A and Child B when Child B was visiting the Nissen home. (Docs. 23-1, at 3; 29-1, at 6–7) (both citing Doc. 23-3, at 15)). At this point, Principal Johnston knew the two children had become friends and was unaware of any current issues between the two. (Docs. 23-1, at 5; 29-1, at 11). Miranda characterized the incident as "the worst possible thing one boy could do to another." (Docs. 29-1, at 6–7 (citing Doc. 23-3, at 15)). Miranda did not explicitly tell Principal Johnston that Child B sexually assaulted Child A. (Docs. 23-1, at 3; 29-1, at 7). The Nissens assert that Miranda did, however, ask what protocols were in place for sexual assault of students. (Docs. 29-1, at 6–7 (citing Doc. 29-3, at 75)). The Nissens assert that this question "was not only [to] gather information, but also to imply to [Principal] Johnston that was what happened [to Child A]." (Doc. 29-1, at 6). Regardless, Principal Johnston answered that there were no protocols for sexual assault under these circumstances, but that she would investigate further. (Docs. 29-2, at 6–7; 32-1, at 10).

The Nissens and the District dispute the scope of Miranda's concerns following this initial disclosure. (*See* Docs. 23-1, at 4; 29-1, at 9). The District asserts that Miranda was concerned with Child A being in the same class as Child B, but was willing to wait until Child A spoke with Mr. Schaefer to make the decision about changing classes.[3] (Doc. 23-1, at 3). The Nissens, however, assert that Miranda was "adamant

---

[3] Plaintiffs and defendant dispute the date that Miranda first suggested that either Child A or Child B be reassigned to the other fifth-grade classroom. Plaintiffs say it was November 26. (Doc. 29-1, at 9 (citing Doc. 29-3, at 72)). Defendant says it was November 27. (Doc. 23-1, at 4 (citing Doc. 23-3, at 78–79)). The exact date of Miranda's request, however, does not affect the Court's analysis.

4

with [Principal] Johnston that Child A not be within sight of Child B," though she acknowledged that Child B still saw Child A because they were still in the same class. (Doc. 29-1, at 9 (citing Doc. 29-3, at 73)).

The parties also dispute which child Miranda requested be moved to a different fifth-grade classroom; the District asserts it was Child A (Doc. 23-1, at 4 (citing Doc. 23-3, at 78–79)), while the Nissens assert it was Child B. (Doc. 29-1, at 8–9). The record, however, supports that Miranda wanted Child B—not Child A—moved to a different class. (Doc. 23-3, at 78–79).

Regardless, it is undisputed that Principal Johnston knew that Miranda was concerned that just being at the same school with Child B made Child A feel unsafe. (Docs. 29-2, at 13; 32-1, at 21–22). But Principal Johnston was worried that the other fifth-grade class would not be a good fit for Child A, and that Child B could not be moved to the other class, anyway, because he had pre-existing issues with other students in that class. (Docs. 29-2, at 7; 32-1, at 10–11).[4]

Further, Principal Johnston said she needed to know more about what was going on before she could address Miranda's request to move Child B. (Docs. 23-1, at 4; 29-1, at 9). The District asserts that the Nissens did not want to talk about the sexual assault at this time. (Doc. 23-1, at 4). The Nissens assert instead that they did not want *Child A to be asked* about the sexual assault at this time, because he had yet to speak with Mr. Schaefer. (*See* Doc. 29-1, at 9 (citing Doc. 23-3, at 175)).

Thus, between November 26 and 28, 2018, Child A continued to be assigned to the same fifth-grade class as Child B. (Docs. 23-1, at 3–4; 29-1, at 7–10). Child A attended class each day. (Docs. 23-1, at 3; 29-1, at 7). As plaintiffs note, however, Child A missed part of class on November 26, 2018, because he "had to go to the office"

---

[4] The Court notes that defendant admits certain facts, including these, for purposes of this motion only.

for refusing to sit next to Child B. (Docs. 23-1, at 3; 29-1, at 7 (both citing Doc. 23-3, at 15)).

At the end of the school day on Wednesday, November 28, 2018, Miranda called Principal Johnston and told her that Child A had spoken to Mr. Schaefer about the incident. (Docs. 23-1, at 4; 29-1, at 10). Then, Miranda told Principal Johnston about the sexual assault; specifically, she told Principal Johnston that Child B had raped Child A by forcibly sodomizing him. (Docs. 23-1, at 4; 29-1, at 11). Miranda also told Principal Johnston that a report was being made to police, and that a report had already been made to the Iowa Department of Human Services. (Docs. 23-1, at 4; 29-1, at 11). Principal Johnston did not make an independent report. (Docs. 29-2, at 8; 32-1, at 12).

On November 29, 2018, Principal Johnston notified relevant staff[5] that Child A would be moving to the other fifth-grade class. (Docs. 23-1, at 5; 29-1, at 12). On that day, Child A and Child B were in the same class and rode the same bus. (Docs. 23-1, at 5; 29-1, at 12). On November 30, 2018, Child A did not come to school because he had an interview at the Child Protection Center ("CPC"). (Docs. 23-1, at 5; 29-1, at 12). The District notes, however, that Child A's confidential CPC report was never provided to anyone in the District. (Doc. 32-1, at 14). Principal Johnston did not discuss the sexual assault with Child A at this or any other time. (Docs. 23-1, at 5; 29-1, at 12).

On December 3, 2018, Principal Johnston moved Child A to the other fifth-grade class. (Docs. 23-1, at 5; 29-1, at 13). That morning, Child A went to Principal Johnston's office and asked to call home. (Docs. 29-2, at 9; 32-1, at 15). When doing

---

[5] In this Order, the Court uses "staff" as shorthand for employees, including administrators, teachers, and staff at North Cedar.

so, he said that "he couldn't do it" and did not want to be in the new classroom. (Docs. 29-2, at 9; 32-1, at 15).[6]

Later that day, Miranda emailed Principal Johnston and informed her that Child A told her that Child B made a threatening gesture[7] at him when the two passed in the hallway and that Child B said he was "going to get [Child A] back." (Docs. 23-1, at 6; 29-1, at 14). When Principal Johnston asked staff about this threat, no one had witnessed the threat or heard anything about it. (Docs. 23-1, at 6; 29-1, at 15). Although Principal Johnston found video of Child A and Child B passing at one point in the hallway on December 3, 2018, the video had no audio. (Docs. 29-2, at 15; 32-1, at 27). Principal Johnston did not interview Child A about the threat. (Docs. 29-2, at 15; 32-1, at 27).

During the week of December 3, 2018, Principal Johnston worked with the Nissens and Mr. Schaefer to implement a safety plan to keep Child A separated from Child B. (Docs. 23-1, at 7; 29-1, at 17).

After attending school on December 3, 2018, Child A missed several days of school that week. (*See* Docs. 29-2, at 10–11; 32-1, at 16–18).

On December 4, 2018, Principal Johnston spoke with Child B about the safety plan to protect Child A and told Child B that he was not to have contact with Child A.

---

[6] Child A's phrase that "he couldn't do it" is understood to mean that he did not want to be in the new classroom. The Court acknowledges that defendant denies that Child A did not want to be in the new classroom. (Doc. 32-1, at 15 (citing Doc. 29-3, at 22)). But defendant's cited page supports that Child A did not want to be in the new classroom. (*See* Doc. 29-3, at 22).

[7] In her affidavit, Miranda states that Child B threatened Child A daily, "the majority of which were nonverbal slicing motions across his neck when teachers weren't looking." (Doc. 29-3, at 77). But defendant "denies the truthfulness of the hearsay allegations contained in [Miranda's] Affidavit." (*See* Doc. 32-1, at 11). Because Miranda is apparently relaying information shared with her by Child A when she comments on the nature of Child B's threatening gestures, the Court construes defendant as denying the truthfulness of Miranda's statement. Nevertheless, Miranda also testified to Child A's daily threats and "nonverbal slicing motions across [Child B]'s neck when teachers weren't looking" elsewhere in the record. (Doc. 23-3, at 22).

7

(Docs. 23-1, at 7; 29-1, at 17). She told Child B that the safety plan was because of accusations and allegations regarding his threatening gesture at Child A. (Docs. 23-1, at 7; 29-1, at 17).

As a part of Child A's safety plan, the District hired a dedicated paraprofessional to be with either Child A or Child B at all times. (Docs. 23-1, at 7; 29-1, at 18). On December 7, 2018, Miranda, Mr. Schaefer, Principal Johnston, and North Cedar's school counselor met to discuss a revised safety plan for Child A. (Docs. 29-2, at 11; 32-1, at 19). The plan included an option to send Child A home if it was too difficult for him to be in the same school as Child B that day. (Docs. 29-2, at 11; 32-1, at 19). After the meeting, Principal Johnston wrote in a note to herself that she had made it clear that not all interaction was avoidable, given North Cedar's layout. (Docs. 29-2, at 11–12; 32-1, at 19). Still, Principal Johnston believed that from Child A's perspective, just seeing child B at school could be traumatizing for Child A. (Docs. 29-2, at 13; 32-1, at 21).

During the following week, some of the revised plan's details—including from where Child A called home and which bathroom Child A used to avoid Child B—were changed. (Docs. 29-2, at 12; 32-1, at 20–21).

On review of the record and according to Miranda's testimony, it appears Child A attended school on December 10 through 14, 2018, and his last day at North Cedar was December 17, 2018. (*See* Doc. 29-3, at 78).

Principal Johnston never investigated Child A's allegations of sexual assault after Miranda's report on November 28, 2018. (Docs. 29-2, at 13; 32-1, at 22–23). This was so even though North Cedar's Liaison from the Cedar Falls Police Department, Officer Ladage, told her that the sexual assault case was "strong." (Docs. 29-2, at 13; 32-1, at 23 (both citing Doc. 29-3, at 15)).

On January 1, 2019, under the assumption that Child B would still be attending North Cedar in 2019, Miranda emailed Principal Johnston to inform her that because Child A did not feel safe at North Cedar, the Nissens would seek open enrollment for Child A at another school. (Docs. 23-1, at 8; 29-1, at 19–20). On January 2, 2019, Principal Johnston emailed the Nissens that she could not "reasonably guarantee" that Child A and Child B would not see each other at school, though she had received approval to continue having a staff member present at all times. (Docs. 29-2, at 17; 32-1, at 31). On January 3, 2019, Miranda responded, sharing her frustration that Child A had not been allowed to call home when scheduled and expressing that Child A could not feel safe at North Cedar under the circumstances. (Docs. 29-2, at 17; 32-1, at 31).

Later on January 3, 2019, Miranda met with District Associate Superintendent Pam Zeigler ("Ms. Zeigler) about transferring Child A under a rule exception. (Docs. 29-2, at 18; 32-1, at 32). That day, Ms. Zeigler informed the Nissens that the District did not accommodate transportation needs for rule exceptions, like Child A's, and that if she made an exception for the Nissens' request, she would have to make exceptions for others. (Docs. 29-2, at 18; 32-1, at 32). Ms. Zeigler could have followed up at the District level to provide transportation to Child A, but she did not. (Docs. 29-2, at 18; 32-1, at 33). Further, Ms. Zeigler said that the District could have made an exception for Child A as a survivor of sexual assault and Child A would have been the only student with that accommodation, but she did not seek out such an exception. (Docs. 29-2, at 18; 32-1, at 33). Ms. Zeigler also had the authority to move Child B to another school if the sexual assault was proven. (Docs. 29-2, at 14; 32-1, at 24). But Ms. Zeigler did not advocate to move Child B because he did not admit to the assault. (*See* Docs. 29-2, at 14; 32-1, at 25). Further, Ms. Zeigler did not discuss the allegations with Officer Ladage. (Docs. 29-2, at 13; 32-1, at 23).

9

Later in January 2019, Child A transferred to Lincoln Elementary. (Docs. 23-1, at 8; 29-1, at 21). Thus, Child A no longer had contact with Child B at school. (Docs. 23-1, at 8; 29-1, at 21).

But, on January 18, 2019, Child A received an email sent to his school email account from Child B's school email account. (Docs. 23-1, at 8; 29-1, at 23 (both citing Doc. 23-3, at 62)). The email contained the word "die" and "a dark-faced emoji." (Docs. 23-1, at 8; 29-1, at 23). The emoji depicts an angry face with horns. (Doc. 23-3, at 62). Principal Johnston testified that it would be traumatic for Child A to receive that message from Child B. (Docs. 29-2, at 16; 32-1, at 28). On January 19, 2019, Child A sent the email to Miranda, and Miranda sent it to the District the next day. (Docs. 23-1, at 8; 29-1, at 23). Child A was not interviewed about the email and Child B denied sending it. (Docs. 29-2, at 16; 32-1, at 29). The District did not block emails between the two students until February 19, 2019 (Docs. 29-2, at 16; 32-1, at 29 (both citing Doc. 29-3, at 138)), although defendant asserts that Principal Johnston took Child B's computer and remained in possession of it until the block was enabled. (Doc. 32-1, at 29 (citing Doc. 29-3, at 138)).

On April 8, 2019, Miranda obtained a protective order ("Order") protecting Child A from Child B. (Docs. 23-1, at 10; 29-1, at 27). Miranda provided the Order to the District on the same day. (Docs. 29-2, at 19; 32-1, at 34). But the District still did not make a transportation exception for Child A (Docs. 29-2, at 19; 32-1, at 34–35), on the basis that Child A was disqualified from bussing when "he voluntarily chose to go [to] a different school." (Docs. 29-2, at 20; 32-1, at 35).

The Nissens' difficulties placing Child A in a safe school environment continued. Although Child A was able to attend the same junior high as Child B while the classes were remote in 2020, no such accommodations existed in the 2021 school year. (*See*

10

Docs. 29-2, at 20–21; 32-1, at 36).  Thus, the Nissens moved Child A to a new school district.  (Docs. 29-2, at 21; 32-1, at 36).

On November 25, 2020, plaintiffs filed a complaint in part claiming that defendant violated Title 20, United States Code, Section 1681(a) ("Title IX") and Title 42, United States Code, Section 1983 ("Section 1983").[8]  (Doc. 1).  Plaintiffs also sued defendant for negligence, premises liability, and loss of consortium.  (*Id.*).  Plaintiffs seek punitive damages for negligence and premises liability.  (*Id.*).

On September 23, 2021, defendant filed its Motion for Partial Summary Judgment on plaintiffs' Title IX claim, Section 1983 claim, and claims for punitive damages.  (Doc. 23).[9]  In response, plaintiffs argue that defendant clearly violated both Title IX and Section 1983.  (Doc. 29).  Plaintiffs do, however, withdraw their request for punitive damages.  (*Id.*, at 21).  Thus, the Court focuses on plaintiffs' Title IX and Section 1983 claims here.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Alternatively, a party may show that "the materials cited do not establish the absence or

---

[8] Defendant does not dispute that Title IX and Section 1983 apply.

[9] The Court notes that although the record refers to defendant's motion as a partial motion for summary judgment and a "request for dismissal" of the same counts, defendant's motion is not a motion to dismiss but a partial motion for summary judgment.  Thus, the Court will refer to it as such.

Case 6:20-cv-02098-CJW-MAR   Document 34   Filed 03/23/22   Page 11 of 42

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the

benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Matsushita*, 475 U.S. at 587-88; *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

If the burden of persuasion at trial would be on the *nonmoving* party, then the party moving for summary judgment may satisfy Rule 56's burden of production in two ways, either by submitting affirmative evidence negating an essential element of the claim, or by demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of their claim. *Bedford v. Doe*, 880 F.3d 993, 996–97 (8th Cir. 2018). If the moving party seeks summary judgment on lack of evidence, then the moving party must affirmatively show the absence of evidence. *Hanson v. FDIC*, 13 F.3d 1247, 1253 (8th Cir. 1994). If the moving party does not satisfy this showing, however, then its motion for summary judgment must be denied, and the Court need not consider whether the nonmoving party has met its ultimate burden of persuasion. *Id.* Here, defendant is the moving party in its motion for summary judgment. Plaintiffs, the nonmoving party, bear the burden of persuasion at trial.

### III. TITLE IX CLAIM

The Court first considers plaintiffs' Title IX claim before turning to plaintiffs' constitutional claim under Section 1983.

Defendant argues that plaintiffs' Title IX claim fails for two reasons. (Doc. 23-2, at 8–14). First, defendant argues plaintiffs cannot show its deliberate indifference to Child A's allegations of sexual harassment because its response was not "clearly unreasonable" (*Id.*, at 9–12), and no causal nexus exists between defendant's response and Child A's sexual harassment. (*Id.*, at 11; 32, at 4–5). Second, defendant argues the harassment was not severe, pervasive, and objectively offensive such that Child A was denied educational opportunities. (*Id.*, at 12–14).[10]

#### A. Deliberate Indifference

The Court first addresses defendant's argument that plaintiffs cannot show deliberate indifference. As the party moving for summary judgment, defendant bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). If defendant meets this burden, then

---

[10] The Court also notes that defendant's brief mentions notice, but does not elaborate that it contests this element of plaintiffs' Title IX claim. (*See* Doc. 23-2, at 10). In their resistance, plaintiffs assert that defendant does not contest notice. (Doc. 29, at 11). Defendant does not correct them in its reply. Thus, the Court, too, assumes that defendant concedes notice for purposes of plaintiffs' Title IX claim. (*But see* Doc. 23-2, at 15 (arguing that lack of prior student-on-student incidence of sexual assault in elementary school precludes notice in Section 1983 context)).

Finally, the Court notes that defendant does not argue that it could not control Child B or his harassment of Child A. Here, Child B was a student of the District and it is undisputed that the District could discipline him and separate him from Child A, as it did, though plaintiffs argue the separation was insufficient and the undisputed facts show that defendant could have done more. Thus, the Court considers Title IX's control requirement met.

plaintiffs, as the nonmoving party, must show evidence of specific facts supporting a genuine issue for trial. *See Mosley*, 415 F.3d at 910.

For the following reasons, the Court finds that defendant fails to meet its initial burden and thus, the Court denies defendant's motion as to deliberate indifference.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Congress enacted Title IX to combat "discrimination on the basis of sex in any educational program that receives federal funding." *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014). "Individuals whose Title IX rights have been violated have a private right of action." *Id.* (citing *Cannon v. Univ. of Chic.*, 441 U.S. 677, 717 (1979)). To succeed on a Title IX claim, a plaintiff must prove: (1) that defendant is a Title IX recipient; (2) the school knows of harassment in its programs or activities; (3) the school was deliberately indifferent to the harassment and the harasser is under its programs or activities; and (4) the "harassment . . . is so severe, pervasive, and objectively offensive that it can be said to deprive the victim[ ] of access to the educational opportunities or benefits provided by the school." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of. Educ.*, 526 U.S. 629, 650 (1999); *see also K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017).

"[A] recipient intentionally violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of [harassment]." *Davis*, 526 U.S. at 643. This includes harassment between students. *Id.* The deliberate indifference standard requires that the school's indifference caused the student to be subjected to harassment. *Culver Stockton Coll.*, 865 F.3d at 1057. Thus, deliberate indifference must either directly cause the abuse to occur or make students vulnerable to

such abuse.[11] *Davis*, 526 U.S. at 645–46 (using plain meaning of "subject"); *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001). As the Sixth Circuit Court of Appeals explained:

> The recipient [need not] "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. The deliberate indifference standard does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. The standard does not mean that recipients must expel every student accused of misconduct. Victims do not have a right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Vance v. Spencer Cnty. Pub. Sch. Dist.* 231 F.3d 253, 260 (6th Cir. 2000). It is not enough, however, that a school merely responded at all. *Doe v. Rutherford Cnty., Tenn., Bd. of Educ.*, No. 3:13-cv-00328, 2014 WL 4080163, at *13 (M.D. Tenn. Aug. 18, 2014). Rather, it must take reasonable action. *Id.*

Courts analyzing deliberate indifference consider whether the response was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; *Guillion ex rel A.M. v. Manson Nw. Webster Sch. Dist.*, 19-CV-3015-CJW-MAR, 2021

---

[11] The Court notes that Eighth Circuit precedent requires that a defendant's response cause subsequent harassment to occur after the plaintiff's initial report of harassment. *See K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *see also Rossley v. Drake Univ.*, 342 F. Supp. 904, 930–31 (S.D. Iowa 2018); *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 134 (D.D.C. 2019) (citing *Culver-Stockton Coll.*, 865 F.3d at 1058)*K.T.*). As indicated by the disjunctive "either" and "or," Eighth Circuit precedent interprets causation as met when (1) the school either directly causes subsequent harassment, or (2) makes students vulnerable to subsequent harassment that occurs. *See, e.g.*, *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021); *Culver-Stockton College*, 865 F.3d at 1057; *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003); *see also Davis ex rel. LaShonda D. v. Monroe Cnty. B. of Ed.*, 526 U.S. 629, 644–45 (1999) ("[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment *or* make them liable or vulnerable to it.") (internal quotation marks omitted and emphasis added).

WL 276702, at *15 (N.D. Iowa Jan. 27, 2021) (quoting *Id.*). Whether a response was clearly unreasonable depends on the time it took the district to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy of the response. *See, e.g.*, *Rutherford Cnty.*, 2014 WL 4080163, at *13; *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669–71 (2d Cir. 2012) (affirming jury's finding of deliberate indifference when the district delayed a response to allegations for a year or more and then gave only a "half-hearted" response). The deliberate indifference standard is often a fact question, but "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649. Thus, the Court can determine a district was not deliberately indifferent if the record supports that finding.

Here, there is no dispute that defendant had knowledge of the harassment and the harassment occurred under its control. (*See* Doc. 23-2, at 9). The question then is whether defendant was deliberately indifferent to the known harassment. Defendant argues the record does not support a finding of deliberate indifference because (1) defendant's response was not clearly unreasonable (Doc. 23-2, at 9–12); and (2) defendant did not cause Child B's harassment of Child A or make Child A vulnerable to it. (*Id.*, at 11).

In response, plaintiffs argue that defendant was deliberately indifferent because it failed to conduct a Title IX investigation into the sexual assault, which created a hostile educational environment for Child A. (Doc. 29, at 11–14). The parties dispute whether failing to conduct a formal Title IX investigation establishes deliberate indifference. (*See* Docs. 29, at 12; 32, at 5–6). Additionally, plaintiffs argue that even if defendant's Anti-Bullying and Harassment Policy could be construed as being in compliance with Title IX, defendant did not follow its own policy and defendant's response was deliberately

indifferent regardless.[12]  (Doc. 29, at 13–14).  Finally, plaintiffs argue that defendant's response to continuing harassment of Child A was deliberately indifferent because it was not reasonably calculated to remedy ongoing threats and harassment.  (*Id.*, at 14–17).

### 1.    *Failure to Conduct a Title IX Investigation*

Because plaintiffs argue that failure to conduct a Title IX investigation, in itself, shows deliberate indifference, the Court turns first to plaintiffs' argument.

Defendant did not have a Title IX policy in place until 2020.  (Docs. 29-2, at 1; 32-1, at 1).  Principal Johnston was unaware of anyone responsible for Title IX and did not understand all that such an investigation entailed.  (Docs. 29-2, at 3; 32-1, at 4).  Principal Johnston turned to Ms. Zeigler, who had never conducted a Title IX investigation prior to 2020 and had no training in sexual assault at the time of Child A's November 2018 report.  (*See* Docs. 29-2, at 4; 32-1, at 5).  Defendant's first Title IX training was on April 10, 2019—several months after Miranda's report of Child A's sexual assault.  (Docs. 29-2, at 4; 32-1, at 6).

Defendant did have an Anti-Bullying and Harassment Policy ("ABH Policy") in place prior to Child B's harassment Child A.[13]  (29-2, at 2; 32-1, at 1–2).  Ms. Zeigler testified that the ABH Policy was the relevant policy for incidents of student-on-student

---

[12] Plaintiffs also argue that defendant's safety plan was clearly unreasonable and allowed Child B to continue harassing Child A.  (*Id.*, at 14–17).  But because the Court finds that defendant fails to meet its initial burden as to each of these elements, it does not reach these arguments.

[13] The Court notes that although defendant mentions the ABH Policy in its statement of facts (Doc. 23-1, at 6) and in its appendix (*see generally* Doc. 23-1, at 181–185), defendant does not mention the ABH Policy in its motion.  Further, it did not include a copy of the ABH Policy in its appendix.  Thus, the Court cannot consider the substance of the ABH Policy when analyzing whether defendant meets its initial burden.  It can only consider the fact that the ABH Policy existed, along with any other undisputed facts.  Plaintiffs, however, introduce evidence of the ABH Policy in their response and appendix.  Thus, the Court can consider the substance of the ABH Policy only if defendant meets its initial burden such that the Court then analyzes whether plaintiffs show a genuine dispute of material fact.

18

sexual harassment or sexual assault. (Docs. 29-2, at 2; 32-1, at 2). The ABH Policy covered misconduct "away from school grounds if [it] directly affects the good order, efficient management and welfare of the school or school district." (Docs. 29-2, at 2; 32-1, at 2). Principal Johnston testified that a student raping another student could "impact the welfare of the school" (Docs. 29-2, at 2; 32-1, at 2–3), though defendant denies such impact actually occurred here. (Doc. 32-1, at 3). Per the ABH Policy, a building principal is responsible for "conduct[ing] a preliminary inquiry and if the 'inquiry indicated bullying or harassment likely occurred, and cannot be resolved at the building level, it may be transitioned' for further investigation." (Doc. 32-1, at 3 (citing Doc. 29-3, at 151–52). Neither Principal Johnston nor Ms. Zeigler discussed Title IX or the ABH Policy's relevance to Child A's circumstances. (*See* Docs. 29-2, at 10–11; 32-1, at 18).

Title 34, Code of Federal Regulations, Section 106.3, does not provide for an automatic violation based on noncompliance. *See also* 34 C.F.R. § 106.8. Further, the Eighth Circuit has not concluded that the lack of a Title IX investigation, alone, is sufficient to show deliberate indifference. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 883–84 (8th Cir. 2014); *Rossley v. Drake Univ.*, 343 F. Supp. 3d 904, 930–31 (S.D. Iowa 2018) (collecting in- and out-of-circuit cases finding lack of Title IX investigation insufficient). *Contra Roohbakhsh v. Bd. of Trs. of Neb. State Coll.*, 409 F. Supp. 3d 719, 736 n.2 (D. Neb. 2019) (collecting out-of-circuit cases finding lack of Title IX investigation sufficient); *Vance*, 231 F.3d at 262; *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999). Thus, as a matter of law, failure to conduct a Title IX investigation, without more, cannot show deliberate indifference.

Further, the Court sees no reason that defendant's failure to follow its own ABH Policy is sufficient to show deliberate indifference. As with Title IX compliance, courts have found that a school's failure to comply with its own sexual harassment policy, alone,

Case 6:20-cv-02098-CJW-MAR   Document 34   Filed 03/23/22   Page 19 of 42

is not sufficient to show deliberate indifference. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 291–92 (1998); *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1340 (D. Kan. 2008); *Williams ex rel. G.W. v. Indep. Sch. Dist. No. 5., of Tulsa Cnty., Okla.*, Case No. 19-CV-499-JFJ, 2021 WL 1646523, at *7 (N.D. Okla. Apr. 27, 2021).

Having found these arguments unavailing, the Court now turns to defendant's arguments.

### 2.    *Clearly Unreasonable*

Defendant fails to meet its initial burden because a reasonable jury could find, based on undisputed facts, that defendant's response to Child B's harassment of Child A was clearly unreasonable.

The Court begins by defining which response by defendant could have violated Title IX. Here, plaintiffs assert that they reported Child A's sexual assault to defendant, and defendant responded with a safety plan that allowed Child B to subsequently sexually harass Child A at school.[14]    (Doc. 29, at 14–15).  Plaintiffs assert that defendant responded by "maintain[ing] its same ineffective response of merely instituting a safety plan it knew it was not working." (*Id.*, at 15).  Although defendant implies that plaintiffs' Title IX claim is based on defendant's response to the sexual assault (Doc. 23-2, at 12 ("Plaintiffs focus on their perceived need for immediate disciplinary action against Child B based solely on their allegations of the sexual assault"), the Court finds plaintiffs' arguments in their resistance based on defendant's response to the harassment are in keeping with the allegations in their complaint.  (*See* Doc. 1, at 2–4 (describing ongoing threats); 6–7 (describing ongoing harassment in Title IX claim)).

The Court notes that as a matter of law, defendant's relevant response in plaintiffs' Title IX claim cannot be its response to Child B's sexual assault of Child A.  First, it is

---

[14] The parties do not dispute that Child B's harassment of Child A was sexual harassment.

undisputed that those acts did not occur under defendant's control. *See Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021); (Docs. 23-1, at 3; 29-1, at 5 (describing sexual assault at Nissen home)). Second, the parties do not argue—and the evidence does not indicate—that defendant knew or should have known that Child B was sexually assaulting other students or at risk for doing so, such that defendant had notice the sexual assault was occurring. *See Shank*, 993 F.3d at 573; *Thorpe v. Breathitt Cnty. Bd. of Educ.*, 8 F. Supp. 3d 932, 946 (E.D. Ky. 2014) ("A school district can only be liable to remedy harassment that it *knew* was occurring."). Instead, the record supports that Child B's behavioral issues before assaulting Child A, though serious, were limited to fighting, bullying, and defiant behavior.

Thus, the Court will analyze whether defendant's response to Child A's sexual assault and subsequent sexual harassment—including Child B's threat on December 3, 2018, and Child B's email to Child A reading "die" on January 18, 2019— violated Title IX.

Viewing the record in the light most favorable to plaintiffs, a reasonable jury could find that defendant's response to Child B's sexual harassment of Child A was "clearly unreasonable in light of known circumstances." *Davis*, 526 U.S. at 648.

Whether defendant's response was clearly unreasonable depends on the known circumstances, and thus several factors must be considered when assessing the response. *See Rutherford Cnty.*, 2014 WL 4080163, at *13; *Zeno*, 702 F.3d at 669–71; *Davis*, 526 U.S. at 648. Although the Court should not second-guess the disciplinary decisions that school administrators make, *see Davis*, 526 U.S. at 648, a reasonable fact-finder may nevertheless properly find deliberate indifference when a school district "ignored the many signals that greater, more directed action was needed."[15] *Zeno*, 702 F.3d at 671.

---

[15] The dissent in *Davis* noted the tension between the majority opinion's admonition against "second-guessing" a district's response and the analysis of whether a district's response was

A reasonable jury could not find, based on the undisputed facts, that defendant's response was clearly unreasonable based on the time defendant took to respond, the effort it expended in its response, or the efficacy of the response. *See Rutherford Cnty.*, 2014 WL 4080163, at *13; *Zeno*, 702 F.3d at 669–71. It is undisputed Miranda reported Child B's harassment of Child A on December 3, 2018, the same day that the hallway threat occurred. (Docs. 23-1, at 6; 29-1, at 14). It is also undisputed that Principal Johnston interviewed staff about the threat, who all stated that they had not witnessed or heard anything (Docs. 23-1, at 6; 29-1, at 15), reviewed video of areas where Child A and Child B could have crossed paths (Docs. 29-2, at 15; 32-1, at 27), and told Child B that he was not to have any contact with Child A at school, in part because of the alleged threat. (Docs. 23-1, at 7; 29-1, at 17). Based on this evidence, a reasonable jury could not find that defendant was slow to respond to the hallway threat, inefficient in its response, or that its level of effort expended in response was so lacking that its response was clearly unreasonable.

A reasonable jury could find, however, that defendant's response to the "die" email sent from Child B's email to Child A took too long and was inefficient, such that it was clearly unreasonable. It is undisputed that the "die" email was sent from Child B's email account to Child A's account on January 18, 2019, reported to defendant on January 19, 2019, and defendant did not block Child B's email account from sending messages to Child A's account until February 19, 2019. (Docs. 29-2, at 16; 32-1, at 29).

---

"clearly unreasonable." *See Davis*, 526 U.S. at 678–79 (J. Kennedy, dissenting) ("The problem is that the majority's test, in fact, invites courts and juries to second-guess school administrators in every case, to judge in each instance whether the school's response was 'clearly unreasonable.'"). The Court also notes that the majority opinion's admonition cites to *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n. 9 (1985), which states that "the courts, should, as a general matter" refrain from second-guessing the judgment of school administrators as to maintaining discipline, particularly in the context of "standards of conduct prescribed by school authorities." Here, defendant's response to harassment—not its standards of conduct—is at issue.

This is so although Principal Johnston told Child B not to contact Child A on December 4, 2018. (Docs. 23-1, at 7; 29-1, at 17). A reasonable jury could find that waiting to block email communication was clearly unreasonable in light of the circumstances, whether it makes this finding based on the two-and-a-half months between the hallway threat and the defendant's email block, or the month between the "die" email and defendant's email block. *See, e.g.*, *Rutherford Cnty.*, 2014 WL 4080163, at *13 (finding deliberate indifference when the district "dragged their feet for months in response to potentially serious allegations of sexual harassment").

A reasonable jury could also find, based on undisputed facts, that defendant's "level of response" to Child B's harassment of Child A—both the December 3, 2018 hallway threat and the January 18, 2019 "die" email—was clearly unreasonable. *See Rutherford Cnty.*, 2014 WL 4080163, at *13; *Zeno*, 702 F.3d at 669–71. A reasonable jury could find defendant's response was "half-hearted" in light of the known circumstances signaling that "more direct action was needed." *See Zeno*, 702 F.3d at 670. Further, a reasonable jury could find that defendant ignored signs that its response was "inadequate" and "not reasonably calculated to end harassment" under the circumstances. *See id.* at 669–671. The following undisputed facts could support such a finding.

First, it is undisputed that Child B bullied Child A during his fourth-grade year (Docs. 23-1, at 1; 29-1, at 2), the year prior to the sexual assault. A reasonable jury could find that given Child B's history of bullying Child A, it was clearly unreasonable to respond to Child B's harassment of Child A as it did.

Second, it is undisputed that Child A suffered from anxiety, apparently beginning in his fourth-grade year, and continuing through his fifth-grade year. (Docs. 23-1, at 2; 29-1, at 2–3). Principal Johnston had been advised that this anxiety was once severe enough to render Child A ill during the night because of anxiety about going to school in

the morning. (Docs. 23-1, at 2; 29-1, at 2–3). Principal Johnston received this report on September 24, 2018—well before the assault or subsequent harassment occurred. It is further undisputed that Child A regularly saw Mr. Schaefer to help Child A cope with his anxiety, and Mr. Schaefer worked closely with North Cedar to improve Child A's experience at school despite the challenges of his anxiety. (Docs. 23-1, at 4; 29-1, at 10). A reasonable jury could find that in light of Child A's debilitating anxiety, it was clearly unreasonable for defendant to respond to Child B's harassment of Child A as it did.

Third, Child B's behavioral issues at North Cedar, including his history of violent behavior, are largely undisputed. These issues included physical fights on the playground. (Docs. 29-2, at 4; 32-1, at 6). Bus records also document Child B hitting children on the bus during the prior school year.[16] (Docs. 29-2, at 4–5 (citing Doc. 29-3, at 154–57; 32-1, at 7). A reasonable jury could find that, given Child B's history of violence, defendant's response was clearly unreasonable. This is particularly so because, in the light most favorable to plaintiffs, Child B's threats were death threats.

Fourth, it is also undisputed that Child B had behavioral issues in the fall of 2018, when the relevant events took place. Plaintiffs asserts that the "behavior[al] issues escalated" at that time, (Doc. 29-2, at 5), and defendant admits this, though it also asserts that it was "hard to say if Child B's behavior got worse or other kids antagonized him more." (Doc. 32-1, at 7 (citing Doc. 29-3, at 10)). But given that when Principal

---

[16] Miranda's affidavit also states that Child B pursued Child A on the bus after she initially reported that an incident had occurred between Child A and Child B and requested that they be kept apart. (Doc. 29-3, at 75–76). This evidence, however, is not undisputed, as defendant "denies the truthfulness of the[se] hearsay allegations." (*See* Doc. 32-1, at 11).
Additionally, the CPC report found that Child B threatened to "beat up Child A" if Child A told anyone about the sexual assault. (Doc. 29-2, at 9). But because this report was not shared with defendant (Doc. 32-1, at 14), its contents cannot be considered when determining the facts known to defendant when it responded to Child A's harassment.

Johnston would discuss Child B's misconduct with him, Child B would deny the misconduct or blame someone else, (Docs. 29-2, at 5; 32-1, at 7–8), a reasonable jury could discount defendant's position. Indeed, it is undisputed that Child B denied sending the "die" email. (Docs. 29-2, at 16; 32-1, at 29). Nevertheless, regardless of why Child B was acting out in the fall of 2018, it appears undisputed that he was indeed acting out. Principal Johnston stated that she could not move Child B to the other fifth-grade class because Child B had serious issues with children in that classroom. (*See* Docs. 29-2, at 7; 32-1, at 10–11). Thus, a reasonable jury could find that, given Child B's demonstrated behavioral issues in the fall of 2018, defendant's response was clearly unreasonable because Child B's threats to Child A were far from the first evidence of behavioral problems at that time.

Fifth, Principal Johnston testified that Child B exhibited strong defiant behavior. (Docs. 29-2, at 4; 32-1, at 8). It is highly likely, if not axiomatic, that children exhibiting strong defiant behavior will defy boundaries set by authority figures. Viewed in conjunction with the foregoing facts, a reasonable jury could find that, given Child B's defiant behavior, defendant's response was clearly unreasonable.

Finally, based on undisputed facts, a reasonable jury could find that defendant's response was clearly unreasonable in light of North Cedar's layout. North Cedar's fifth-grade classrooms are located very close to one another. Specifically, the fifth-grade classrooms are directly across the hall from one another. (Docs. 29-2, at 6; 32-1, at 9). Indeed, part of defendant's response was to have a paraprofessional accompany either Child A or Child B at all times to mitigate the risk of their contact in the hallway. (Docs. 23-1, at 7; 29-1, at 18). Further, a student in one classroom can see into the other classroom. (Docs. 29-2, at 6; 32-1, at 9). So, even after defendant moved Child A to the other fifth-grade class on December 3, 2018, Child A and Child B were still in the same small section of hallway such that they could see each other from the classroom

windows. Principal Johnston acknowledged that from Child A's perspective, just seeing Child B at school could be traumatizing. (Docs. 29-2, at 13; 32-1, at 21). North Cedar's two fifth-grade teachers expressed serious concern about whether it was actually possible to keep Child B apart from Child A. (Docs. 29-2, at 9; 32-1, at 15). Thus, a reasonable jury could find that defendant's response was clearly unreasonable because it did not reasonably prevent Child B from harassing Child A after the December 3, 2018 threat.

In sum, based on any combination of the foregoing findings drawn from undisputed facts, a reasonable jury could find defendant's level of response was inadequate in light of known circumstances such that it was clearly unreasonable. Thus, defendant does not meet its initial burden.

Having addressed defendant's clearly-unreasonable argument, the Court now turns to defendant's argument on the causal nexus—another requirement of deliberate indifference.

### 3. Causal Nexus

For the following reasons, the Court finds that defendant fails to meet its initial burden because a reasonable jury could find, based on undisputed facts, that defendant's response to Child B's harassment of Child A made Child A vulnerable to harassment.

Defendant argues that plaintiffs fail to show a causal nexus between the District's actions and Child A's experience of sexual harassment. (Doc. 23-2, at 11; 32, at 4–5). In response, plaintiffs argue that the District's deliberate indifference made Child A more vulnerable to sexual harassment by Child B. (Doc. 29, at 12–13).

Viewing the record in the light most favorable to plaintiffs, a reasonable jury could find, based on undisputed facts, that defendant's indifference made Child A vulnerable to subsequent harassment that actually occurred. *Culver Stockton Coll.*, 865 F.3d at 1057; *see also Shrum*, 249 F.3d at 782.

Here, a reasonable jury could find that defendant's response to Child B's hallway threat made Child A vulnerable to Child B's subsequent harassment. Miranda told Principal Johnston that Child B threatened Child A in the hallway, ostensibly when teachers were not looking. (Docs. 23-1, at 6; 29-1, at 14). After Child A changed schools to avoid interaction with Child B, Child B contacted Child A via email by sending him the message "die" with a menacing emoji. (Docs. 23-1, at 8; 29-1, at 23). Principal Johnson did not interview Child A about the hallway threat. (Docs. 29-2, at 15; 32-1, at 27). After the hallway threat, defendant did not block Child B from contacting Child A via school email, a means within its control, until a month after the "die" email was reported. (Docs. 29-2, at 16; 32-1, at 29). A reasonable jury could find that, by keeping Child A and Child B in school but in different fifth-grade classes and failing to prevent Child B from contacting Child A via school email, defendant's response made Child A vulnerable to subsequent harassment that actually occurred—that is, the "die" email. This is, however, a close call in the Court's eyes. The undisputed evidence does not suggest that Child B had previously used email to harass, bully, or threaten Child A or other children.[17] In hindsight, it becomes clear that defendant should have blocked Child B's email, but that does not mean that it is clear that it should have known before the threat was made that blocking the email was necessary to protect Child A. Nevertheless, whether the potential for Child B to further threaten Child A through email was reasonably foreseeable is a question better left for the jury than this Court.

---

[17] The Court independently notes that plaintiffs' appendix includes Principal Johnston's deposition testimony about concerns relating to Child B's communications on Seesaw, a school application, which Miranda brought to Principal Johnston's attention on November 30, 2018. (Doc. 29-3, at 19). The parties, however, do not reference Child B's communications on Seesaw in their arguments or statements of fact.

Thus, a reasonable jury could find that defendant's response made Child A vulnerable to sexual harassment by Child B, thereby fulfilling the causal nexus in plaintiffs' Title IX claim.

In sum, defendant fails to meet its initial burden because a reasonable jury could find that defendant's response to Child B's harassment of Child A was both clearly unreasonable and caused Child A to be vulnerable to subsequent harassment. Thus, the Court denies defendant's motion as to deliberate indifference.

### B. Nature of the Harassment

For the following reasons, the Court finds that defendant fails to meet its initial burden and thus, the Court denies defendant's motion as to the nature of the harassment.

"[I]n the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652. "Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender." *Id.*

When determining whether the harassment is actionable, a court considers the "constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim, and the number of individuals involved." *Id.* at 651 (internal quotation and citation omitted). A court also considers how long the harassment occurred, how close in time the harassing incidents were to one another, and the degree of mental anguish caused by the harassment. *See Burrow ex rel. Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193, 1206 (N.D. Iowa 1996); *Zeno*, 702 F.3d at 669–71; *Rutherford Cnty.*, 2014 WL 4080163, at *13. But a student's "depression, self-harm, and isolation" and fear that the harasser would "harm [him] again," without more, is insufficient to show actionable harassment. *Doe v. Dardanelle*

*Sch. Dist.*, 928 F.3d 722, 727 (8th Cir. 2019) (student victim's academic performance improved after harassment and facts did not indicate any negative interaction with harasser after initial harassment occurred); *see also Culver-Stockton*, 865 F.3d at 1058 (dismissing the plaintiff's deliberate indifference claim because "[a]t most, [plaintiff] link[s] the [defendant's] inaction with emotional trauma [plaintiff] claims she experienced following the assault").

Collectively, the harassment must have "a systemic effect" of denying the student victim of equal access to education. *Davis*, 526 U.S. at 652. In theory, even a single instance of harassment might have a systemic effect. *Id.*, at 652–53. In *Davis*, however, the Supreme Court cautioned that this was likely not the intent of Congress. *Id.* And Eighth Circuit courts have found a single instance of harassment insufficient to impose Title IX liability. *See Culver Stockton Coll.*, 865 F.3d at 1057; *Doe T.L.J. v. Univ. of Central Mo.*, Case No. 4:20-00714-CV-RK, 2020 WL 7700101 at *3 (E.D. Mo. Dec. 28, 2020). *But see S.S. ex rel. K.S. v. Raytown Quality Sch. Dist.*, 2021 WL 3557650, at *4–5 (W.D. Mo. Aug. 11, 2021) (collecting out-of-circuit cases holding that a single instance is sufficient and holding that single instance of sexual assault sufficient to survive motion to dismiss).

Harassment has been found actionable when it prevents physical access to school resources. *Davis*, 526 U.S. at 651–52 (using example of access to "an athletic field or a computer lab"). But harassment need not physically deny the victim equal access to education. *See id.*

Lower courts within the Eighth Circuit have found that fear of future encounters between a rape victim and his assailant could create an environment sufficiently hostile to deprive the victim of access to educational opportunities, although the Eighth Circuit Court of Appeals does not appear to have addressed the issue. *Fryberger v. Univ. of Ark.*, No. 5:16-cv-5224, 2019 WL 6119253, at *10 (W.D. Ark. Nov. 18, 2019) (motion

for summary judgment); *Kelly v. Yale Univ.*, No. Civ.A. 3:01–CV–1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003) (same); *Kinsman v. Fla. State. Univ. Bd. of Trs.*, Case No. 4:15cv235-MW/CAS, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015) (motion to dismiss). The Tenth Circuit Court of Appeals has addressed this issue. In *Farmer v. Kansas State University*, that court found harassment was sufficiently alleged where the rape victims' fear of encountering their assailants "forced them to take very specific actions that deprived them of the educational opportunities offered to other students." 918 F.3d 1094, 1104–105 (10th Cir. 2019) (motion to dismiss). But the *Farmer* Court also cautioned that future courts "will undoubtedly be asked to draw lines on when a victim's fear of further sexual harassment is sufficient to deprive that student of educational opportunities" and that it had "no hesitation" in its present holding because the motion before the court was "a motion to dismiss, where all inferences are drawn in favor of Plaintiffs." *Id.*, at 1105.

The student victim's withdrawal from school because of the harassment has also been found to sufficiently deny access to education. *Roohbakhsh*, 409 F. Supp. 3d at 734; *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1298 (11th Cir. 2007).

Here, defendant argues that no evidence in the record supports that it caused Child A to experience harassment that was severe, pervasive, and objectively offensive such that it denied Child A equal access to education. (Doc. 23, at 12–14). Defendant argues that Child A did not report the sexual assault to his parents "for a number of weeks," despite the fact that Child A and Child B shared the same class and rode the same bus, and that no intervening harassment occurred between the sexual assault and Child A's disclosure of it. (*Id.*). Defendant also argues that plaintiffs only allege one

30

in-person incident of post-sexual assault harassment or bullying[18] after Child A changed classes. (*Id.*).

Defendant fails to meet its initial burden because a reasonable jury could find, based on undisputed facts, that Child B's harassment of Child A was severe, pervasive, and objectively offensive such that it deprived Child A of equal access to education.

The Court rejects defendant's argument implying that Child A's harassment is not actionable because Child A delayed in reporting the sexual assault and no intervening harassment occurred between the assault and the report. Child A's delay in reporting the rape and apparent discomfort in reporting it directly are not relevant to the nature of the harassment that followed the report of sexual harassment.

The Court is also unpersuaded by defendant's argument that plaintiffs only allege one in-person incident of "post-sexual assault harassment or bullying" after Child A changed classes. (*Id.*). This argument misses the mark. Indeed, it is undisputed that Child A said that Child B threatened him in the hallway. The record supports that this threat occurred after Miranda initially disclosed to defendant that an incident had occurred between Child A and Child B, and that that incident was the "worst possible thing one boy could do to another." (Docs. 23-1, at 3; 29-1, at 6–7) (both citing Doc. 23-3, at 15)). Importantly, this was not the only undisputed instance of a threat by Child B on Child A. Child A also received the "die" email with a menacing emoji from Child B's school email account after the change in classes occurred. (Docs. 23-1, at 6, 8; 29-1, at 14, 23). Just because this incident took place over email and was not "in-person" does not mean that it is not actionable, particularly when defendant controlled Child B's email account and access to his computer. (Docs. 29-2, at 16; 32-1, at 29 (both citing Doc.

---

[18] Reviewing the record, the Court assumes defendant means Child B's threat when passing Child A in the hallway, when Child B allegedly made a threatening gesture and said he would "get [Child A] back."

29-3, at 138)). Thus, this is not a situation where a single-instance of harassment is alleged and the evidence can conceivably support "a systemic effect" of denying the student victim equal access to education. *See Davis*, 526 U.S. at 652.

Considering the "constellation of surrounding circumstances" presented by undisputed facts, a reasonable jury could find Child B's harassment of Child A was sufficiently severe, pervasive, and objectively offensive such that it deprived Child A of his right to an equal education.

Understandably, Child A suffered fear and mental anguish based on Child B's sexual assault and harassment. (*See, e.g.*, Docs. 29-2, at 11; 32-1, at 19). But this is not the only evidence that the harassment is actionable under Title IX. *See Dardanelle*, 928 F.3d at 727; *Burrow*, 929 F. Supp. at 1206.

Viewing the undisputed facts in the light most favorable to plaintiffs, Child B's threats to Child A (the one in the hallway and the email) were death threats. The Court cannot say these are clearly "simple acts of teasing and name-calling" for which Title IX provides no recovery. *Davis*, 526 U.S. at 652. Child B made these death threats after he bullied Child A during the prior school year, apparently led Child A to believe they were friends, and then raped Child A. In this context, a reasonable jury could find that the harassment—that is, Child B's death threats on Child A—were severe and objectively offensive.

Whether the harassment is pervasive is a closer question, but a reasonable jury could nevertheless find that the harassment satisfies this requirement for purposes of summary judgment. The period of harassment is relatively short here, with one threat occurring on December 3, 2018 and the other occurring January 19, 2019. The Court also notes, however, that Child A did miss multiple days of school during the week of December 3, 2018 (*see* Docs. 29-2, at 10–11; 32-1, at 16–18), and plaintiffs transferred Child A from North Cedar to Lincoln Elementary after the holiday break. (Docs. 23-1,

32

at 8; 29-1, at 21).  Considering Child A was in school for so few days after the hallway threat, a reasonable jury could view the hallway threat and the "die" email—though only two instances of harassment—as sufficiently pervasive because the opportunity for harassment was lessened by Child A's absence.  Indeed, Child A stayed home from school or left school early due to his fear of Child B.  (*See* Docs. 29-2, at 10–11; 32-1, at 16–18).  Viewing the undisputed facts in the light most favorable to the plaintiffs, Child B's opportunities to harass Child A were minimized by plaintiffs' actions—not defendant's.  Plaintiffs kept Child A home from school on some days and pulled Child A out of North Cedar.  Defendant did block Child B from contacting Child A via school email, but only after Miranda reported the "die" email.  Thus, the Court finds that whether pervasiveness is adequately met is an appropriate question for the jury—not the Court.[19]  *See Doe A. v. Green*, 298 F. Supp. 2d 1025, 1036 (D. Nev. 2004).

And a reasonable jury could find that the harassment deprived Child A of an equal education because he was moved from his established class and again forced to learn in an environment where he felt unsafe, to the point where he would leave school early due to his fears about encountering his rapist, Child B.  *Kinsman*, 2015 WL 11110848, at *4; *Kelly*, 2003 WL 1563424, at *3.  Further, a reasonable jury could find that Child A ultimately withdrew from the school to avoid exposure to Child B.  *See Roohbakhsh*, 409 F. Supp. 3d at 734; *Williams*, 477 F.3d at 1298.

---

[19] Further, the Court notes that had it found that defendant met its initial burden as to the nature of harassment, it nevertheless would find a genuine dispute of material fact based on plaintiffs' arguments and evidence.  (*See, e.g.*, Docs. 29, at 17–19; 29-2, at 9 (citing Doc. 29-3, at 20 (describing Child A's fear of returning to school after Child B's hallway threat)).  Notably, both defendant's appendix (Doc. 23-2, at 22) and plaintiffs' appendix (Doc. 29-3, at 72) includes Miranda's testimony that Child B was making "daily threats" to Child A similar to the hallway threat and that Miranda was informing Principal Johnson of them daily.  A reasonable jury would be more likely to find actionable harassment, and particularly pervasiveness, based on this evidence.

For these reasons, defendant fails to meet its initial burden and the Court denies defendant's motion as to the nature of the harassment.[20]

In sum, defendant's motion as to plaintiffs' Title IX claim is denied. The Court now turns to defendant's motion as to plaintiffs' Section 1983 claim.

## IV.    SECTION 1983 CLAIM

For the following reasons, the Court grants defendant's motion as to plaintiffs' Section 1983 claim.

Plaintiffs allege that defendant's failure to train its staff on Title IX violates Section 1983.[21] (Doc. 1, at 8–10). Defendant argues that plaintiffs' Section 1983 claim fails "for the same reasons" as their Title IX claim. (Doc. 23).

A school district can violate Section 1983 by failing to train its employees. *See e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1122 (8th Cir. 2005); *P.H. v. Sch. Dist.*, 265 F.3d 653, 660 (8th Cir. 2001). To establish a failure-to-train theory under Section 1983, a plaintiff must make four showings.[22]

First, the plaintiff must show that the District's training practices were inadequate. *B.A.B., Jr. v. Bd. of Educ.*, 698 F.3d 1037, 1040 (8th Cir. 2012). Whether training is inadequate depends "on whether the [district's training] program is adequate to the tasks the particular employees must perform." *Canton*, 489 U.S. at 379.

---

[20] Because the Court denies summary judgment on other grounds, it does not reach plaintiffs' additional arguments on this issue. (Doc. 29, at 17–19).

[21] The Court notes that defendant describes plaintiffs' Section 1983 claim as "alleg[ing] the District lacked appropriate written policies and failed to train employees." (Doc. 23-2, at 14). Reviewing plaintiffs' claim (Doc. 1, at 8–10), the Court interprets plaintiffs' claim as relying only on a failure-to-train theory. Thus, the Court will analyze it as such.

[22] The Court notes that Eighth Circuit precedent varies in how it discusses and enumerates the elements of a failure-to-train claim under Section 1983. Nevertheless, the cases generally discuss all four elements listed here, although they may not enumerate them as the Court does here.

Second, "the plaintiff must show that the [district's] failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of the students." *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 461 (8th Cir. 2009) (alteration and quotations omitted); *see also B.A.B., Jr.*, 698 F.3d at 1040; *Canton*, 489 U.S. at 389. The district's "[i]naction must be the 'moving force [behind] the constitutional violation.'" *S.M. v. Lincoln Cnty.*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Canton*, 489. U.S. at 389). Thus, the standard for deliberate indifference in a Section 1983 claim, although still demanding, is more general than its Title IX counterpart. *See Dardanelle*, 928 F.3d at 725 n.2. (comparing Section 1983 standard requiring "deliberate indifference to the rights of students for § 1983 failure-to-train claims" to Title IX standard requiring "'deliberate indifference to known acts of harassment in . . . programs or activities' for Title IX student-on-student harassment claims"). Further, deliberate indifference cannot be found unless the district's failure to train was "a deliberate or conscious choice." *See Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (quotation omitted).

Third, the plaintiff must show, in one of two ways, that the District had notice. In the context of Section 1983 liability, "[n]otice is the touchstone of deliberate indifference." *Atkinson v. City of Min. View*, 709 F.3d 1201, 1216 (8th Cir. 2013). A plaintiff can show the school had "notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Parrish*, 594 F.3d at 998 (quotation omitted). The likelihood of violation must make "the need for training is patently obvious." *Webb v. City of Waterloo*, No. 17-CV-2001-CJW-MAR, 2019 WL 6736219, at *22 (N.D. Iowa Dec. 11, 2019) (quoting *S.J. v. Kan. City Pub. Sch. Dist.*, 294 F.3d 1025, 1029 (8th Cir. 2002)). Alternatively, a plaintiff can show "a pattern of constitutional violations [that] put the [defendant] on notice that its employees' responses to a regularly recurring situation are insufficient to protect the constitutional rights of its citizens." *Thelma D. ex rel. Delores A. v. Bd. of Educ.*, 934 F.2d 929, 935 (8th Cir.

1991).  Thus, although Section 1983's deliberate indifference requirement is not as strict as Title IX's deliberate indifference, Section 1983's notice requirement is comparable to its Title IX counterpart.  *See Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010) (discussing "comparable notice standards").

Finally, the plaintiff must show that the "alleged deficiency in the [district's] training procedures actually caused the plaintiff's injury."  *B.A.B., Jr.*, 698 F.3d at 1040 (alteration omitted) (quoting *Parrish*, 594 F.3d at 997 (quoting *Canton*, 489 U.S. at 389))).  The causation standard is "rigorous . . . to ensure that the [defendant] is not held liable solely for the actions of its employee."  *Szalba v. City of Brooklyn Park, Minn.*, 486 F. 3d 385, 390 (8th Cir. 2007) (quoting *Bd. of Cnty. Cmrs. v. Brown*, 520 U.S. 394, 405 (1997)).

Defendant generally reasserts its Title IX arguments in its motion as to plaintiffs' Section 1983 claim.  (Doc. 23).  Defendant argues that plaintiffs cannot show deliberate indifference or causation in their Title IX claim.  (Doc. 23-2, at 8–14).  Although the bulk of defendant's briefing on Section 1983 states what plaintiffs must prove (*see id.*, at 14–15), defendant also makes limited argument on these elements.  (*Id.*, at 15).  Thus, defendant argues plaintiffs cannot show deliberate indifference or causation in their Section 1983 claim.  Defendant also asserts in its brief that plaintiffs show "no evidence of any prior incidence of sexual assaults of elementary students."  (*Id.*, at 15 (also describing notice requirement)).  The Court interprets this as arguing that plaintiffs cannot show notice.

In sum, defendant argues that plaintiffs cannot support three elements of their failure-to-train claim under Section 1983: deliberate indifference, notice, and causation.[23]

---

[23] In its argument on plaintiffs' Title IX claim, defendant argues its response was not clearly unreasonable.  But defendant neither argued that its training practices were adequate nor showed undisputed facts supporting their adequacy.  Further, defendant's limited argument in its brief states only that plaintiffs must show inadequacy, but does not argue that they fail to do so.  (*See*

36

In response, plaintiffs argue that defendant violated Child A's right to equal protection because it failed to have any Title IX training. (Doc. 29, at 20–21).

The Court turns its analysis of whether defendant meets its initial burden of showing that plaintiffs fail to show the elements of the failure-to-train claim and, if so, whether plaintiffs show a genuine dispute of material fact. *See Hartnagel*, 953 F.2d at 395; *Mosley*, 415 F.3d at 910.

Because defendant incorporates its Title IX arguments into its Section 1983 arguments and does not "identify[ ] those portions of the record which show a lack of a genuine issue" in its briefing on plaintiffs' Section 1983 claim, *see Hartnagel*, 953 F.2d at 395, the Court will analyze defendant's Title IX arguments here based on the undisputed facts it considered when analyzing them.[24] *See Bedford*, 880 F.3d at 996–98.

First, defendant fails to meet its initial burden of showing a lack of evidence of deliberate indifference, such that its decision not to train was a "conscious choice." Defendant argues that the Court's "findings regarding 'deliberate indifference' are equally applicable to the § 1983 claims." (Doc. 23-2, at 15). The Court has already found that a reasonable jury could find deliberate indifference under Title IX. But, deliberate indifference is not analyzed in the same way under Title IX and Section 1983. *See Dardanelle*, 928 F.3d at 725 n.2. Thus, despite defendant's request, the Court will not rely on that finding.

Nevertheless, the Court finds a reasonable jury could find deliberate indifference for purposes of Section 1983 based on the undisputed facts the Court addressed in the

---

Doc. 23-2, at 14–15). Thus, the Court does not interpret defendant as arguing that plaintiffs fail to show inadequacy here.

[24] The Court notes that defendant does not argue that plaintiffs' failure-to-train claim fails because its ABH Policy was sufficient. Further, the undisputed facts regarding the ABH Policy speaks only to the policy itself and not to any related training in sexual assault or harassment. (*See* Docs. 23-1, at 6; 29-1, at 16; 29-2, at 2; 32-1, at 1–2).

Title IX claim, because a reasonable jury could find defendant's failure to train was a conscious choice and was deliberately indifferent to the rights of students. It is undisputed that the District did not have a Title IX policy in place until 2020 (Docs. 29-2, at 1; 32-1, at 1), that Principal Johnston, a school principal, was unaware of anyone responsible for Title IX and did not understand all that such an investigation entailed, (Docs. 29-2, at 3; 32-1, at 4), and that defendant did not hold a Title IX training until April 10, 2019—several months after Miranda reported Child A's sexual assault and subsequent harassment. (Docs. 29-2, at 4; 32-1, at 6). There is no dispute that defendant, as a federal funding recipient, was subject to Title IX and knew of its requirements. As a federal funding recipient, defendant is required to comply with Title IX to protect students' rights to equal education. 34 C.F.R. § 106.1 (describing requirements as effectuating Title IX amendments "designed to eliminate . . . discrimination on the basis of sex in any education program or activity receiving Federal financial assistance"). The question here is whether defendant's failures were the result of deliberate decisions or negligence and ignorance. Although it is a very close call, the Court finds a reasonable jury could find that defendant consciously chose not to train its staff on how to comply with Title IX and was thus deliberately indifferent to the rights of students to be free from discrimination on the basis of sex in their education.

Second, defendant fails to meet its initial burden to show that plaintiffs cannot show notice. Defendant argues that plaintiffs cannot show defendant had notice because "no evidence supports any prior incidents of sexual assaults of elementary students." (Doc. 23-2, at 15). But defendant includes no support for this assertion, either in its motion, brief, or statement of undisputed facts.[25] (*See* Docs. 23, 23-1, 23-2). Although

---

[25] On independent review, the Court notes that defendant's appendix includes evidence supporting this assertion. (Doc. 23-3, at 181–82). The Court also notes that plaintiffs submitted this evidence in their resistance to defendant's motion, and although defendant mentions plaintiffs' evidence when admitting one of plaintiffs' additional statements of fact, the underlying

defendant "informs the Court of the basis for its motion," it does not "identify[ ] those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. Thus, defendant fails to meet its initial burden.

Third, defendant meets its initial burden to show that plaintiffs cannot show causation. Again, because defendant relies on the arguments in its Title IX motion, the Court turns to its causal nexus analysis there. In defendant's Title IX argument, defendant argued that its "actions did not cause Child A to undergo harassment or make Child A vulnerable to it." (Doc. 23-2, at 11). Considering the undisputed facts, the Court found that a reasonable jury could find that defendant's response made Child A vulnerable to harassment. The Court did not, however, make a finding as to direct causation. Section 1983 requires direct causation. *B.A.B., Jr.*, 698 F.3d at 1040 (finding the failure-to-train must "actually cause[ ] the plaintiff's injury"). In its Title IX argument, defendant shows evidence supporting that its response did not directly injure Child A. (*See* Doc. 23-2, at 11). Thus, defendant meets its initial burden.

Turning to plaintiffs' argument, the Court finds that plaintiffs do not show a genuine issue of material fact regarding causation. Plaintiffs' argument in support of its Section 1983 claim is based on defendant's "blatant lack" of compliance with Title IX, including its failure to train staff on Title IX. (Doc. 29, at 19–21). Specifically, plaintiffs argue that defendant had notice that its procedures were inadequate and likely to cause a constitutional violation. (*Id.*, at 21 (citing *Szalba*, 485 F.3d at 390 (quoting *Brown*, 520 U.S. at 405)). Thus, plaintiffs argue that Child A would not have been deprived of an equal education had defendant trained its staff on Title IX. (*Id.*).

---

undisputed fact was "Ms. Ziegler had never conducted a Title IX investigation prior to 2020"— not that she "was not aware of any instances of student-on-student sexual harassment that were ever reported at the elementary level." (*See* Doc. 32-1, at 5 (citing Doc. 29-3, at 47 (plaintiffs' appendix))). Thus, it is not undisputed that there were no prior instances of student-on-student sexual harassment at the elementary level.

It is undisputed that Principal Johnston and Ms. Zeigler, the two District employees who led the District's response to Child A's sexual assault and harassment, did not conduct a Title IX investigation and lacked the training and experience to do so. Principal Johnston was unaware of anyone responsible for Title IX and did not understand all that such an investigation entailed. (Docs. 29-2, at 3; 32-1, at 4, 17). Principal Johnston turned to Ms. Zeigler who had never conducted a Title IX investigation prior to 2020 and had no training in sexual assault at the time of Child A's November 2018 report. (*See* Docs. 29-2, at 4; 32-1, at 5). Neither Principal Johnston nor Ms. Zeigler discussed Title IX's relevance to Child A's circumstances. (Docs. 29-2, at 11; 32-1, at 18). Ms. Zeigler did not discuss the sexual assault with Officer Ladage. (Docs. 29-2, at 13; 32-1, at 23). This was so even though Ms. Zeigler had the authority to move Child B to another school if the sexual assault was proven. (Docs. 29-2, at 14; 32-1, at 24). Ms. Zeigler also denied the Nissens' rule exception as to a transportation accommodation so Child A would not have to ride the bus with Child B, even though she could have followed up "at the District level to provide transportation to Child A." (Docs. 29-2, at 18; 32-1, at 32–33).

But plaintiffs do not present any evidence supporting that these decisions would have changed had defendant trained its staff on Title IX. In a motion for summary judgment, the nonmoving party must substantiate its allegations with enough probative evidence to support a jury finding in its favor—without simply relying on mere speculation or conjecture. *Clay v. Credit Bureau Enter.*, 754 F.3d 535, 539 (8th Cir. 2014). On the record, a reasonable jury could not find that defendant's failure to train caused Child A's sexual harassment. Plaintiffs instead rely on mere speculation or conjecture that defendant's staff responded as they did because they were not trained in Title IX. They point to no probative evidence supporting that defendant's lack of Title IX training actually caused Child A's sexual harassment.

40

Additionally, plaintiffs' cited precedent is unhelpful. Plaintiffs cite *Szalba* as supporting that a lack of Title IX training "would have—and should have—provided notice that a constitutional violation was likely to result." (Doc. 29, at 21 (citing 486 F.3d at 390)). *Szalba* states that "[w]here a plaintiff claims that the [defendant] has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the [defendant] is not held liable solely for the actions of its employee." 486 F.3d at 390 (quoting *Brown*, 520 U.S. at 405). *Szalba* goes on to state that "only where a [defendant]'s failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the [defendant] be liable for an unconstitutional policy under § 1983." *Id.* (citing *Brown*, 520 U.S. at 406–407).

The Court has already found that defendant fails to meet its initial burden as to deliberate indifference. The issue now is causation. The Court cannot say that plaintiffs meet that "rigorous" standard here. *See Szalba*, 486 F. 3d at 390 (quoting *Brown*, 520 U.S. at 405). It is easier to see the burden that plaintiffs shoulder by looking to Section 1983 cases involving school districts and deprivation of the rights of students, not municipalities and deprivation based on law enforcement action, as in *Szalba*, *Brown*, and *S.M.*[26] In the school district context, a plaintiff must show that "the deficiency in the training procedures actually caused the [student's] injuries." *Frishchnecht v. Reeds Spring R-IV Sch. Dist.*, Case No. 3:20-05084-CV-RK, 2020 WL 7395143, at *3 (W.D. Mo. Dec. 16, 2020) (citing *Parrish*, 594 F.3d at 997). Further, a plaintiff must also

---

[26] The Court notes that plaintiffs also cite *S.M. v. Lincoln Cnty.*, 874 F.3d 581 (8th Cir. 2017) as supporting that "the lack of Title IX policy or procedures" is "plainly the 'moving force' behind the constitutional violation" that plaintiffs assert. (Doc. 29, at 21). *S.M.* provides that municipal inaction must be the "moving force [behind] the constitutional violation." 874 F.3d at 585. As above, however, plaintiffs do not show evidence that the lack of a Title IX policy was the moving force causing Child A's harassment here. (*See* Doc. 29, at 21).

show "that a 'direct causal link' connects the District's action and the alleged deprivation of [the student]'s rights." *See id.* (quoting *Shrum*, 249 F.3d at 778). In *Frishchnecht*, on a motion to dismiss, the court found "Plaintiffs merely allege[d] there was inadequate training, yet provide[d] no factual allegations as to . . . how such deficient training actually caused Plaintiffs' injuries." *Id.*

Here, as in *Frishchnecht*, plaintiffs do not show facts supporting that defendant's failure to train its staff on Title IX actually caused Child A's harassment. Thus, the Court finds plaintiffs do not show a genuine dispute of material fact as to whether defendant's failure-to-train actually caused Child A's injury.

For these reasons, the Court finds defendant fails to meet its burden as to deliberate indifference and notice. The Court also finds, however, that defendant meets its burden to causation and plaintiffs do not show a genuine dispute of material fact. Thus, the Court grants defendant's motion as to plaintiffs' failure-to-train claim under Section 1983.

## V. CONCLUSION

For these reasons, defendant's Motion for Partial Summary Judgment (Doc. 23) is **granted in part and denied in part**. Defendant's motion for summary judgment on plaintiffs' claims for punitive damages is **denied as moot**. Defendant's motion for summary judgment on plaintiffs' Title IX claim is **denied**. Defendant's motion for summary judgment on plaintiffs' Section 1983 claim is **granted**. The Clerk's office is directed to term the motion at Doc. 24 as it is an unnecessary and duplicative filing.

**IT IS SO ORDERED** this 23rd day of March, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa